UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES BRUEN, Individually and on Behalf of All Others Similarly Situated, | § § § | Case No.: |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| COPANO ENERGY, L.L.C., KINDER MORGAN ENERGY PARTNERS, L.P., KINDER MORGAN G.P., INC., JAVELINA MERGER SUB LLC, WILLIAM L. THACKER, R. BRUCE NORTHCUTT, JAMES G. CRUMP, ERNIE L. DANNER, SCOTT A. GRIFFITHS, MICHAEL L. JOHNSON, MICHAEL G. MACDOUGALL, and T. WILLIAM PORTER, | § § § § § § § § § § | |
| Defendants. | § § | |
| | § | |

**COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
VIOLATION OF FEDERAL SECURITIES LAWS**

1.      Plaintiff Charles Bruen, by and through his undersigned counsel, individually and on behalf of all other similarly situated unitholders of Copano Energy, L.L.C. ("Copano" or the "Company"), brings the following Complaint for Breach of Fiduciary Duties and Violations of Federal Securities Laws against Copano, members of Copano's Board of Directors (the "Board" or "Individual Defendants"), Kinder Morgan Energy Partners, L.P. ("KMP"), a Delaware limited partnership, Kinder Morgan G.P., Inc. ("KMP GP"), a Delaware corporation and the general partner of KMP, and Javelina Merger Sub LLC ("Merger Sub"), a Delaware limited liability company and a direct, wholly-owned subsidiary of KMP (KMP, KMP GP, and Merger Sub are collectively referred to herein as "Kinder Morgan"), arising out of their breaches of fiduciary duties and/or other violations of state law, and/or aiding and abetting thereof, in connection with Kinder Morgan's attempt to purchase Copano for inadequate consideration (the "Proposed Acquisition") and to the detriment of Copano's public unitholders.  Plaintiff makes the following allegations upon knowledge as to plaintiff and upon information and belief (including investigation of counsel and review of publicly available information) as to all other matters, and alleges as follows.

## SUMMARY OF THE ACTION

2.      This is a unitholder class action brought on behalf of the holders of Copano common units against Copano, its Board, and Kinder Morgan for breaches of fiduciary duty and/or other violations of state law, and/or aiding and abetting thereof, arising out of Copano's largest unitholder's attempt to consummate the Proposed Acquisition pursuant to an unfair process and for an unfair price.  This matter arises out of defendants' dissemination of a false and misleading Proxy Statement in violation of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 of the U.S. Securities and Exchange Commission ("SEC") promulgated thereunder, and the Board's breaches of its fiduciary duties owed to the Company's unitholders under state law.

3.      Copano is a midstream natural gas company with operations in Texas, Oklahoma, and Wyoming.

4.      KMP is a leading pipeline transportation and energy storage company and one of the largest publicly traded pipeline limited partnerships in America.  It owns an interest in or operates approximately 46,000 miles of pipelines and 180 terminals.

5.      On January 29, 2013, Copano and Kinder Morgan announced that they had entered into a definitive agreement (the "Merger Agreement") whereby Kinder Morgan would acquire all of Copano's outstanding units for just .4563 KMP units per Copano unit.  Upon completion of the transaction, Copano will become a wholly-owned subsidiary of Kinder Morgan.

6.      The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Copano to Kinder Morgan on terms preferential to defendants and other Copano insiders and to subvert the interests of plaintiff and the other public unitholders of the Company.  The Proposed Acquisition is being driven entirely by and for the benefit of Copano's largest unitholder, private equity firm TPG Copenhagen, L.P. ("TPG") (through its designee on the Copano Board, defendant Michael G. MacDougall ("MacDougall")), and the rest of the members of the Board and Company management.  TPG is the beneficial owner of 14% of Copano's outstanding units, or 12,897,029 Series A convertible preferred units of the Company, which, pursuant to the terms of the Series A preferred, is convertible on a one-for-one basis into Copano's common units. With the change of control under the Proposed Acquisition, however, TPG will receive an additional 10% (or a 1 preferred unit for 1.1 common units conversion ratio) in Copano common units.  This additional 10% premium is an extraordinary special benefit not being provided to Copano's other unitholders.

7.      From the Proposed Acquisition, Copano's officers and directors will receive millions of dollars in special payments – not being made to ordinary unitholders – for currently unvested unit

options, performance units, and restricted units, all of **which shall, upon completion of the transaction, become fully vested and exercisable**.  Plaintiff further alleges on information and belief that the Company's senior management is also entitled to receive from the Proposed Acquisition millions of dollars in change-of-control payments.  Thus, Board members are conflicted and serving their own financial interests rather than those of Copano's other unitholders.

8.      Moreover, the Company's management appears to be staying on board for the long term after the Proposed Acquisition closes.  Once the acquisition is final, Copano will operate as a wholly-owned subsidiary of Kinder Morgan and continue to be led by Copano's existing management team.  In the announcement of the Proposed Acquisition, KMP Chairman and Chief Executive Officer ("CEO") Richard D. Kinder stated: "We anticipate retaining the vast majority of Copano's approximately 415 employees."  Thus, in being retained by Kinder Morgan, Copano's management gets the best of both worlds: they can cash out their equity holdings and retain their current positions without being subject to the hassles and filing requirements of running a publicly traded company.

9.      The Board's selected financial advisors, Barclays Capital Inc. ("Barclays") and Jefferies & Company, Inc. ("Jefferies") are also conflicted.  Both will only be paid a multi-million dollar, but contingent, success fee if the Proposed Acquisition closes.  Moreover, for its 2011 $21.1 billion acquisition of the El Paso Corporation ("El Paso"), Kinder Morgan, Inc. ("KMI") which owns the general partner and limited partner interests in KMP, retained Barclays as one of its financial advisors, for which retention Barclays was paid a multi-million dollar fee.  In the El Paso deal, KMI also received financing from Barclays to pay for the $11.5 billion cash portion of the deal, for which financing Barclays received over $50 million more in fees from KMI.  And KMI retained Barclays as its financial advisor on KMI's 2012 $7.15 billion sale of El Paso's oil-exploration business, for which Barclays received yet another multi-million dollar fee from KMI.

10.     The conflicted and unfair process has resulted in the Proposed Acquisition price, which is unfair and undervalues Copano's standalone value and its value to Kinder Morgan.  Based upon KMP's closing unit price of $87.61 on January 30, 2013, Copano unitholders will receive consideration valued at approximately $39.97 per unit.  The $39.97 per unit offer price is below the $41 target price that has been projected by an analyst at Ladenburg Thalman & Co. since November 12, 2012.  Further, on November 7, 2012, Copano reported financial results for the third quarter of 2012, which reflected a 4% increase in revenue from the third quarter of 2011 and a 15% increase from the second quarter of 2012.  In addition, Copano's Generally Accepted Accounting Principles ("GAAP") earnings per share ("EPS") of $0.23 for the third quarter of 2012 comfortably beat analyst estimates of $0.06 by 271%.  In a Company press release, Copano President and CEO, defendant R. Bruce Northcutt ("Northcutt"), said, "Our third quarter results highlight our strengthening operational performance and continued progress in executing on our Eagle Ford strategy."

11.     Nor does the Proposed Acquisition price properly compensate Copano unitholders for the value the Company will provide to Kinder Morgan.  Copano unitholders will own less than 15% of KMP's outstanding units if the Proposed Acquisition closes.  Yet demand for natural gas is projected to rise in the United States as power plants and industry increase their consumption of the fuel.  Almost all of the increase in domestic natural gas production is expected to come from shale gas.  Shale gas already contributes to around 35% of U.S. dry gas production.  The acquisition will allow KMP to expand its footprint and increase capacity in some of the largest shale gas plays in North America.  Through the acquisition, KMP will expand its presence in the Eagle Ford Shale in Texas, which is considered to be one of the most promising areas in North America due to its rising high quality output and proximity to key markets.  KMP was already in a joint venture with Copano for gas gathering in the Eagle Ford Shale and will now become the sole owner of this operation. KMP will also gain access to operations in the Barnett Shale in northern Texas, which is one of the

largest shale basins in North America (in terms of production).  Besides this, KMP will also get access to the Mississippi Lime and Woodford Shales in Oklahoma.  Additionally, KMP can also benefit from Copano's capacity expansion projects for which it already has customer commitments.  Copano provides services to natural gas producers, including processing, treating, and natural gas liquids fractionation, and this is likely to complement KMP's existing natural gas pipelines business.  The Proposed Acquisition should also help KMP increase revenues and shipping volumes of its natural gas pipelines division.

12.     To ensure Kinder Morgan, and only Kinder Morgan, acquires Copano, defendants included several deal protection devices in the Merger Agreement.  These deal protection devices will preclude a fair sales process for the Company and lock out competing bidders, and include: (i) a no-shop clause that will preclude the Company from soliciting potential competing bidders; (ii) a matching rights provision that would require the Company to disclose confidential information about competing bids to Kinder Morgan, and allow Kinder Morgan to match any competing proposal; and (iii) a termination and expense fee provision that would require the Company to pay Kinder Morgan $115 million if the Proposed Acquisition is terminated in favor of a superior proposal.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Copano.

13.     Moreover, defendants have entered into a voting agreement with TPG (the "Voting Agreement") pursuant to which, among other things, TPG has agreed to vote all of its Series A preferred units and common units in favor of the merger *and against any alternative acquisition proposal*.

14.     The Voting Agreement and the onerous and preclusive deal protection devices operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company.  In combination and in total, the Voting Agreement

and the deal protection provisions in the Merger Agreement, discussed above, effectively preclude any other potential bidders from consummating an offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for unitholders before agreeing to the Proposed Acquisition.

15.     In an attempt to secure unitholder support for the unfair Proposed Acquisition, the defendants, on February 12, 2013, issued a materially false and misleading Registration Statement on Form S-4 (the "Proxy").  The Proxy, which recommends that Copano unitholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information which will preclude Copano unitholders from casting an informed vote on the Proposed Acquisition.  The Proxy omits a number of material facts necessary to make statements made therein not false and misleading, including:

> (a)     the strategic alternatives available to the Company;

> (b)     the financial projections relied on by the Board's financial advisors, Barclays and Jefferies, in their valuation analyses;

> (c)     the inputs and data underlying the financial analyses of the Board's financial advisors, Barclays and Jefferies; and

> (d)     the potential conflicts of interest burdening Copano's financial advisor, Jefferies.

16.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Moreover, the deal protection devices and the Voting Agreement collectively operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Copano. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm

to the Company's unitholders.  Plaintiff seeks equitable relief only to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Exchange Act for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

18.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b), (c), and (d).  Numerous defendants maintain their offices, have agents, transact business, and are found within this judicial district.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein arose in part within this judicial district, including the negotiations leading up to the execution of the Merger Agreement.  Finally, defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein are and have been carried out in part within this judicial district.

## PARTIES

20.     Plaintiff Charles Bruen is, and at all times relevant hereto was, a unitholder of Copano.

21.     Defendant Copano is Delaware limited liability company with headquarters in Houston, Texas, and is sued herein as an aider and abettor.

22.     Defendant KMP is a Delaware limited partnership with headquarters in Houston, Texas, and is sued herein as an aider and abettor.

23.     Defendant KMP GP is a Delaware corporation and the general partner of KMP, and is sued herein as an aider and abettor.

24.     Defendant Merger Sub is a Delaware limited liability company and a direct, wholly owned subsidiary of KMP, and is sued herein as an aider and abettor.

25.     Defendant William L. Thacker is Chairman of the Board of the Company.  He is and at all times relevant hereto has been a member of the Board.

26.     Defendant Northcutt is and at all times relevant hereto has been President and CEO of the Company and a member of the Board.

27.     Defendant James G. Crump is and at all times relevant hereto has been a member of the Board.

28.     Defendant Ernie L. Danner is and at all times relevant hereto has been a member of the Board.

29.     Defendant Scott A. Griffiths is and at all times relevant hereto has been a member of the Board.

30.     Defendant Michael L. Johnson is and at all times relevant hereto has been a member of the Board.

31.     Defendant MacDougall is and at all times relevant hereto has been a member of the Board, and is TPG's designee on the Board.

32.     Defendant T. William Porter is and at all times relevant hereto has been a member of the Board.

33.     The defendants named above in ¶¶25-32 are sometimes collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

34.     Under Delaware law and Copano's Fourth Amended and Restated Limited Liability Company Agreement, in any situation where the directors of Copano undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the Company's unitholders, and if such transaction will result in a change of control, the unitholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

        (a)     adversely affects the value provided to the Company's unitholders;

        (b)     will discourage or inhibit alternative offers to purchase control of the Company or its assets;

        (c)     contractually prohibits them from complying with their fiduciary duties;

        (d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the Company's unitholders; and/or

        (e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

35.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Copano, are obligated under Delaware law to refrain from:

        (a)     participating in any transaction where the directors' or officers' loyalties are divided;

        (b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the corporation; and/or

- 9 -

(c)      unjustly enriching themselves at the expense or to the detriment of the public unitholders.

36.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to plaintiff and other public unitholders of Copano.  Defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits, including personal financial benefits, not shared equally by plaintiff or the Class (as defined below), and are choosing not to provide unitholders with all the information necessary to make an informed decision in connection with the Proposed Acquisition.  As a result of defendants' self-dealing and divided loyalties, neither plaintiff nor the Class will receive adequate or fair value for their Copano units in the Proposed Acquisition.

37.      Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon the Individual Defendants as a matter of law.

## THE PROPOSED ACQUISITION

38.      Copano is a midstream natural gas company with operations in Texas, Oklahoma, and Wyoming.  KMP is a leading pipeline transportation and energy storage company and one of the largest publicly traded pipeline limited partnerships in America.  It owns an interest in or operates approximately 46,000 miles of pipelines and 180 terminals.

39.      On January 29, 2013, Copano and Kinder Morgan announced that they had entered into the Merger Agreement whereby Kinder Morgan would acquire all of Copano's outstanding units for just .4563 KMP units per Copano unit.  Upon completion of the transaction, Copano will become a wholly-owned subsidiary of Kinder Morgan.

40.   The press release announcing the Proposed Acquisition states in pertinent part:

**KMP to Acquire Copano for Approximately $5 billion in Unit for Unit Transaction**

Kinder Morgan Energy Partners, L.P. and Copano Energy, L.L.C. today announced a definitive agreement whereby KMP will acquire all of Copano's outstanding units for a total purchase price of approximately $5 billion, including the assumption of debt. The transaction, which has been approved by the boards of directors of both companies, will be a 100 percent unit for unit transaction with an exchange ratio of .4563 KMP units per Copano unit. The consideration to be received by Copano unitholders is valued at $40.91 per Copano common unit based on KMP's closing price as of Jan. 29, 2013, representing a 23.5 percent premium to Copano's close on Jan. 29, 2013. The transaction, which is expected to close in the third quarter of 2013, is subject to customary closing conditions, including regulatory approval and a vote of the Copano unitholders. TPG, Copano's largest unitholder (owning over 14 percent of its outstanding equity), has agreed to support the transaction.

Copano, a midstream natural gas company with operations primarily in Texas, Oklahoma and Wyoming, provides comprehensive services to natural gas producers, including natural gas gathering, processing, treating and natural gas liquids fractionation. Copano owns an interest in or operates about 6,900 miles of pipelines with 2.7 billion cubic feet per day (Bcf/d) of natural gas throughput capacity and 9 processing plants with more than 1 Bcf/d of processing capacity and 315 million cubic feet per day of treating capacity.

"We are delighted to have reached this agreement with Copano, a company that we know very well and have partnered with through the years, as this transaction will enable us to significantly expand our midstream services footprint," said KMP Chairman and CEO Richard D. Kinder. "As a result of this acquisition, we will be able to pursue incremental development in the Eagle Ford Shale play in south Texas, gain entry into the Barnett Shale Combo in north Texas and the Mississippi Lime and Woodford Shales in Oklahoma. We continue to be bullish on the domestic shale plays and believe they will drive substantial future growth at KMP. Copano's assets are very complementary to ours, as KMP is principally a pipeline transportation and storage company, while Copano is primarily a fee-based gathering, processing and fractionation player. Broadening our midstream assets will allow us to offer a wider array of services to our customers."

"We are excited to have reached this agreement with KMP, which delivers a significant premium to our unitholders that is reflective of the strength and potential of our business and provides an ownership interest in a highly diversified industry leader with an impressive history of sustained distribution growth," said Copano President and CEO R. Bruce Northcutt. "Through this transaction, Copano will become part of a larger, investment grade organization with stable cash flows and the financial resources to fund our increasing number of high-return growth projects. We are committed to continuing to support our customers with the highest quality service, and expect that KMP's size and scale will allow us to provide even more value for customers. In addition, we expect this combination will provide

- 11 -

opportunities for our many talented employees.  We look forward to completing this transaction and to building significant long-term value for all of our stakeholders as part of KMP."

"Copano is already executing on a substantial backlog of expansion projects for which it has secured customer commitments and is exploring a significant amount of projects incremental to these," Kinder added.  "Given the growth in cash flow that will come from the projects already in progress with existing customer commitments, we expect the multiple of EBITDA paid for Copano to decline to the very low double digits over the next few years and considering the growth opportunities beyond that, we expect continued attractive EBITDA growth from these assets thereafter."

The acquisition of Copano is expected to be accretive to cash available for distribution to KMP unitholders upon closing.  The general partner of KMP, Kinder Morgan, Inc. (NYSE: KMI), has agreed to forego a portion of its incremental incentive distributions in 2013 in an amount dependent on the time of closing. Additionally, KMI intends to forgo $120 million in 2014, $120 million in 2015, $110 million in 2016 and annual amounts thereafter decreasing by $5 million per year from this level.  The transaction is expected to be modestly accretive to KMP in 2013, given the partial year, and about $0.10 per unit accretive for at least the next five years beginning in 2014.

"Copano's cash flow is largely and increasingly fee based, and our accretion projections are based on commodity prices consistent with the current forward curve for the portion that is sensitive to commodity prices," Kinder explained.

The acquisition will be immediately accretive to KMI's cash available to pay dividends, even after KMI foregoes a portion of the incremental incentive distributions this transaction is expected to produce.  The increase in KMI's cash available to pay dividends (net of the amounts voluntarily foregone) is expected to be approximately $25 million in 2014 growing to approximately $70 million in 2016.

"We anticipate retaining the vast majority of Copano's approximately 415 employees," Kinder said.  "This transaction is about producing future cash flow and expanding our midstream services footprint."

Copano is headquartered in Houston, Texas, and has a sizable office in Tulsa, Okla., which KMP intends to maintain.

Upon closing, KMP will own 100 percent of Eagle Ford Gathering (currently a joint venture with Copano), which provides gathering, transportation and processing services to natural gas producers in the Eagle Ford Shale.  Eagle Ford Gathering comprises approximately 400 miles of pipelines (including its capacity rights in certain KMP pipelines) with capacity to gather and process over 700,000 MMBtu/day.

Citi acted as financial advisor for KMP and Weil Gotshal & Manges LLP and Bracewell & Giuliani acted as legal counsel to KMP.  Barclays Capital Inc. and

Jefferies & Company, Inc. provided financial advisory services to Copano and Wachtell, Lipton, Rosen & Katz acted as legal counsel to Copano.

41.     The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Copano to Kinder Morgan on terms preferential to defendants and other Copano insiders and to subvert the interests of plaintiff and the other public unitholders of the Company.  The Proposed Acquisition is being driven entirely by and for the benefit of Copano's largest unitholder, private equity firm TPG (through its designee on the Copano Board, defendant MacDougall), and the rest of the members of the Board and Company management.  TPG is the beneficial owner of 14% of Copano's outstanding units, or 12,897,029 Series A convertible preferred units of the Company, which, pursuant to the terms of the Series A preferred, is convertible on a one-for-one basis into Copano's common units.  With the change of control under the Proposed Acquisition, however, TPG will receive an additional 10% (or a 1 preferred unit for 1.1 common units conversion ratio) in Copano common units.  This additional 10% premium is an extraordinary special benefit not being provided to Copano's other unitholders.  Thus, Board members are conflicted and serving their own financial interests rather than those of Copano's other unitholders.

42.     From the Proposed Acquisition, Copano's officers and directors will receive millions of dollars in special payments – not being made to ordinary unitholders – for currently unvested unit options, performance units, and restricted units, all of *which shall, upon completion of the transaction, become fully vested and exercisable*.  Plaintiff further alleges on information and belief that the Company's senior management is also entitled to receive from the Proposed Acquisition millions of dollars in change-of-control payments.  Thus, Board members are conflicted and serving their own financial interests rather than those of Copano's other unitholders.

43.     Moreover, the Company's management appears to be staying on board for the long term after the Proposed Acquisition closes.  Once the acquisition is final, Copano will operate as a wholly-owned subsidiary of Kinder Morgan and continue to be led by Copano's existing

management team.  In the announcement of the Proposed Acquisition, KMP Chairman and CEO Richard D. Kinder stated: "We anticipate retaining the vast majority of Copano's approximately 415 employees."  Thus, in being retained by Kinder Morgan, Copano's management gets the best of both worlds: they can cash out their equity holdings and retain their current positions without being subject to the hassles and filing requirements of running a publicly traded company.

44.     The Board's selected financial advisors, Barclays and Jefferies are also conflicted. Both will only be paid a multi-million dollar, but contingent, success fee if the Proposed Acquisition closes.  Moreover, for its 2011 $21.1 billion acquisition of El Paso, KMI retained Barclays as one of its financial advisors, for which retention Barclays was paid a multi-million dollar fee.  In the El Paso deal, KMI also received financing from Barclays to pay for the $11.5 billion cash portion of the deal, for which financing Barclays received over $50 million more in fees from KMI.  And KMI retained Barclays as its financial advisor on KMI's 2012 $7.15 billion sale of El Paso's oil-exploration business, for which Barclays received yet another multi-million dollar fee from KMI.

45.     The conflicted and unfair process has resulted in the Proposed Acquisition price, which is unfair and undervalues Copano's standalone value and its value to Kinder Morgan.  Based upon KMP's closing unit price of $87.61 on January 30, 2013, Copano unitholders will receive consideration valued at approximately $39.97 per unit.  The $39.97 per unit offer price is below the $41 target price that has been projected by an analyst at Ladenburg Thalman & Co. since November 12, 2012.  Further, on November 7, 2012, Copano reported financial results for the third quarter of 2012, which reflected a 4% increase in revenue from the third quarter of 2011 and a 15% increase from the second quarter of 2012.  In addition, Copano's GAAP EPS of $0.23 for the third quarter of 2012 comfortably beat analyst estimates of $0.06 by 271%.  In a Company press release, Copano's President and CEO, defendant Northcutt, said, "Our third quarter results highlight our strengthening operational performance and continued progress in executing on our Eagle Ford strategy."

46. Nor does the Proposed Acquisition price properly compensate Copano's unitholders for the value the Company will provide to Kinder Morgan. Copano unitholders will own less than 15% of KMP's outstanding units if the Proposed Acquisition closes. Yet demand for natural gas is projected to rise in the United States as power plants and industry increase their consumption of the fuel. Almost all of the increase in domestic natural gas production is expected to come from shale gas. Shale gas already contributes to around 35% of U.S. dry gas production. The acquisition will allow KMP to expand its footprint and increase capacity in some of the largest shale gas plays in North America. Through the acquisition, KMP will expand its presence in the Eagle Ford Shale in Texas, which is considered to be one of the most promising areas in North America due to its rising high quality output and proximity to key markets. KMP was already in a joint venture with Copano for gas gathering in the Eagle Ford Shale and will now become the sole owner of this operation. KMP will also gain access to operations in the Barnett Shale in northern Texas, which is one of the largest shale basins in North America (in terms of production). Besides this, KMP will also get access to the Mississippi Lime and Woodford Shales in Oklahoma. Additionally, KMP can also benefit from Copano's capacity expansion projects for which it already has customer commitments. Copano provides services to natural gas producers, including processing, treating, and natural gas liquids fractionation, and this is likely to complement KMP's existing natural gas pipelines business. The Proposed Acquisition should also help KMP increase revenues and shipping volumes of its natural gas pipelines division.

47. To ensure Kinder Morgan, and only Kinder Morgan, acquires Copano, defendants included several deal protection devices in the Merger Agreement. These deal protection devices will preclude a fair sales process for the Company and lock out competing bidders, and include: (i) a no-shop clause that will preclude the Company from soliciting potential competing bidders; (ii) a matching rights provision that would require the Company to disclose confidential information about

competing bids to Kinder Morgan, and allow Kinder Morgan to match any competing proposal; and (iii) a termination and expense fee provision that would require the Company to pay Kinder Morgan $115 million if the Proposed Acquisition is terminated in favor of a superior proposal. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Copano.

48. Moreover, defendants have entered into the Voting Agreement with TPG pursuant to which, among other things, TPG has agreed to vote all of its Series A preferred units and common units in favor of the merger *and against any alternative acquisition proposal*.

49. The Voting Agreement and the onerous and preclusive deal protection devices operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company. In combination and in total, the Voting Agreement and the deal protection provisions in the Merger Agreement, discussed above, effectively preclude any other potential bidders from consummating an offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for unitholders before agreeing to the Proposed Acquisition.

50. In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Moreover, the deal protection devices and the Voting Agreement collectively operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Copano. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's unitholders. Plaintiff seeks equitable relief only to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## THE FALSE AND MISLEADING PROXY

51.    In an attempt to secure unitholder support for the unfair Proposed Acquisition, on February 13, 2013, defendants issued the materially false and misleading Proxy to Copano unitholders.  The Proxy, which recommends that Copano unitholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the process leading up to the Merger Agreement, the unfair consideration offered in the Proposed Acquisition and the actual intrinsic value of the Company's assets both as a stand-alone entity and as a merger partner for Kinder Morgan.  Specifically, the Proxy omits and/or misrepresents the material information set forth below in contravention of sections 14(a) and 20(a) of the Exchange Act.

52.    ***The strategic alternatives available to the Company, other than a sale transaction***. The Proxy does not disclose any information about the strategic alternatives available to Copano, which renders the Board's recommendation that the "that the merger agreement and the merger are advisable and in the best interests of Copano and its unitholders" materially misleading.  This statement does not explain the alternatives against which the merger was evaluated, nor does it provide any analysis of those alternatives and their financial impact on the Company.  In fact, it appears that the Board decided not to seek out alternative transactions.  This information is material because unitholders are entitled to know why the Board preferred the merger over other alternatives, as well as the nature and financial viability of those other alternatives.

53.    ***Whether the Board considered and/or sought to protect the offered merger consideration through a price collar***.  The Proxy discusses the consideration in the form of Kinder Morgan common units, but does not disclose any Board discussions about a collar for the Kinder Morgan stock to ensure it did not drop significantly in value after the Proposed Acquisition was announced. This information is material to unitholders because a collar provision would protect Copano unitholders from Kinder Morgan's unit price, which recently dropped.  Because the

exchange ratio is fixed, the decrease in Kinder Morgan's unit price has pushed down the value offered to Copano unitholders.

54. ***The other potential buyers contacted by Barclays***.  The Proxy states that Copano's management and Barclays' worked together to identify potential partners in a sale transaction. However, the Proxy fails to identify the number of potential partners.  Nor does the Proxy disclose to Company unitholders how many of the partners were financial versus strategic partners.  This information is material because the Board has a duty to secure the best possible price for the Company's shares, and unitholders are entitled to full and fair disclosure of their efforts, or lack thereof, to do so.  Company unitholders are entitled to know whether the process was designed to seek out all legitimate buyers.

55. ***The members of management responsible for handling discussions with the other bidders***.  The Proxy states generally that members of Copano management met with representatives of interested parties, but it does not disclose which members participated in those meetings.  This information is material, because unitholders are entitled to know whether individuals with interests divergent from unitholders were responsible for negotiating with potential buyers in those meetings (and thus, whether the negotiations were truly at arm's-length).

56. ***The basis for the Board not to establish a Special Committee of independent directors to consider and vote on the transaction***.  As noted above, several Board members are conflicted due to their ties to TPG, or due to the millions of dollars in special payments from currently unvested unit options, performance units, and restricted units that will vest as soon as the deal closes.  This information is material, because unitholders are entitled to know whether those conflicts compromised the decision of the Board.

57. ***The proposals submitted by the two other interested parties***.  The Proxy states that two other parties "demonstrated significant apparent interest" in a potential acquisition of Copano

and later submitted proposals for the Company. However, other than a range of value, the Proxy does not provide any details regarding the proposals submitted by these bidders, including whether the offers were all-cash, all-stock, or some combination thereof, and whether those proposals contemplated post-merger employment for Company management. The Proxy also does not explain why one of the parties elected to withdraw from the process. The omission of this information renders the Proxy materially misleading, because the Board has a duty to secure the best possible price for the Company's shares, and unitholders are entitled to full and fair disclosure of their efforts, or lack thereof, to do so.

58.     ***The reason(s) why the Board felt it was necessary to hire a second financial advisor (Jefferies) to perform an analysis of the value of the Company***. The Proxy states that as the sales process had nearly concluded, the Board hired Jefferies as a second financial advisor. But it does not explain why a second advisor was necessary. This information is material because it allows unitholders to evaluate whether the fairness opinions offered by Barclays and Jefferies are the product of independent advice.

59.     ***Whether (and if so, when) Kinder Morgan and Copano discussed post-merger employment for defendants as well as Copano's executives***. The omission of this information renders the Proxy materially misleading because Company unitholders must be told of all potential and actual conflicts of interests that bear on an advisor's ability to objectively assess the value of merger transactions.

60.     ***The two sets of financial projections provided by Copano management and relied upon by Barclays and Jefferies for purposes of their analyses, for fiscal years 2013 through 2016, for the following items: (i) Adjusted earnings before interest and taxes (EBIT) (or depreciation and amortization (D&A)); (ii) capital expenditures; (iii) interest expense; (iv) any other line items used in the calculation of free cash flow; (v) levered free cash flow; and (vi) total distribution per***

*unit*. The Proxy states that management of Copano provided Barclays with several sets of financial projections. However, the Proxy fails to disclose the projections to Company unitholders. Defendants' failure to disclose this information renders the Proxy false and misleading because Copano unitholders are entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections form the bases for the analyses offered by the Board's financial advisors and the value assumptions presented to the buyer, Kinder Morgan.

61.     ***The financial projections for Kinder Morgan, provided by Wells Fargo and relied upon by Jefferies for purposes of its analysis, for fiscal years 2013 through 2016, for the following items: (i) EBITDA; (ii) EBIT (or D&A); (iii) capital expenditures (2014 through 2016 only); (iv) interest expense; (v) any other line items used in the calculation of free cash flow; (vi) levered free cash flow; (vii) distributable cash flow, less GP interest (2014 through 2016 only); (viii) total distributable cash flow per LP unit (2014 through 2016 only); LP distribution per unit (2014 through 2016 only)***. The Proxy fails to disclose the projections prepared and provided by Copano management to Jefferies. Defendants' failure to disclose this information renders the Proxy false and misleading because Copano unitholders are entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections form the bases for the analyses offered by the Board's financial advisors and the value assumptions presented to the buyer, Kinder Morgan.

62.     ***With respect to Barclays' Discounted Cash Flow (DCF) Analysis for Copano: (i) the definition of unlevered free cash flow used by Barclays in its analysis; (ii) the inputs and assumptions used by Barclays to derive the ranges of discount rates (8% to 10.5%) used in its analysis, and (iii) the separate resulting indications of value from this analysis derived from using the Case I and Case II projections***. These omissions render the Proxy materially misleading because they have a significant impact on the outcome of the DCF analysis. Unitholders are entitled

to know the basis for the selection of these inputs so that they can determine if they are appropriate and if not, select their own to arrive a value of the Company that more appropriately values its assets.  Without disclosure of these inputs into Barclays' DCF analysis, unitholders cannot determine if the outcome of Barclays' DCF analysis is an adequate measure of the Company's intrinsic value, and thus do not have the information necessary to make a competent decision whether to vote in favor of the Proposed Acquisition.

63.     ***With respect to Barclays' DCF Analysis for Kinder Morgan: (i) the methodology and assumptions used by Barclays to determine the distributions to be paid by Kinder Morgan in years 2013 through 2016; and (ii) the resulting indications of value from Barclays' analysis***. These omissions render the Proxy materially misleading because they have a significant impact on the outcome of the DCF analysis.  Without this information, Company unitholders cannot determine whether the exchange ratio offered by Kinder Morgan is fair to Company's unitholders.

64.     ***With respect to Barclays' Comparable Company Analysis for Copano, the individually observed multiples for each of the comparable public companies selected by Barclays in its analysis of Copano, including: (i) last quarter annualized (LQA) distribution yield; (ii) 2012E DCF per unit yield; (iii) 2013E DCF per unit yield; and (iv) 2014E DCF per unit yield***. The Proxy sets forth a "summary" of Barclays' Comparable Companies Analysis, but it fails to disclose many of the critical inputs for that analysis.  The omission of the multiples is material because it impacts the Comparable Companies Analysis, which assesses the public market value of the Company as compared to comparable midstream companies and, without this information, unitholders are unable to independently assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

65.     ***With respect to Barclays' Comparable Company Analysis for Copano, the multiples selected and applied by Barclays as part of this analysis of Copano***.  The Proxy sets forth a

"summary" of Barclays' Comparable Companies Analysis, but it fails to disclose many of the critical inputs for that analysis. The omission of the multiples is material because it impacts the Comparable Companies Analysis, which assesses the public market value of the Company as compared to comparable midstream companies and, without this information, unitholders are unable to independently assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

66.     *With respect to Barclays' Comparable Company Analysis for Copano, the separate resulting indications of value for Copano based on this analysis from each of the multiples selected and applied*. The resulting indications of value are material because they will allow unitholders to independently assess whether Barclays' analysis, as set forth in the Proxy, fairly captures the value of the Company.

67.     *With respect to Barclays' Comparable Company Analysis for Kinder Morgan, the individually observed multiples for each of the comparable public companies selected by Barclays in its analysis of Kinder Morgan, including: (i) LQA distribution yield; (ii) 2012E DCF per unit yield; (iii) 2013E DCF per unit yield; and (iv) 2014E DCF per unit yield*. The Proxy sets forth a "summary" of Barclays' Comparable Companies Analysis, but it fails to disclose many of the critical inputs for that analysis. The omission of the multiples is material because it impacts the Comparable Companies Analysis, which assesses the public market value of the Company as compared to comparable midstream companies and, without this information, unitholders are unable to independently assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

68.     *With respect to Barclays' Comparable Company Analysis for Kinder Morgan, the multiples selected and applied by Barclays as part of this analysis of Kinder Morgan*. The Proxy sets forth a "summary" of Barclays' Comparable Companies Analysis, but it fails to disclose many of

the critical inputs for that analysis.  The omission of the multiples is material because it impacts the Comparable Companies Analysis, which assesses the public market value of the Company as compared to comparable midstream companies and, without this information, unitholders are unable to independently assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

69.      *With respect to Barclays' Comparable Company Analysis for Kinder Morgan, the separate resulting indications of value for Kinder Morgan based on this analysis from each of the multiples selected and applied*.  The resulting indications of value are material because they will allow unitholders to independently assess whether Barclays' analysis, as set forth in the Proxy, fairly captures the value of the Company.

70.      *With respect to Barclays' Comparable Transactions Analysis: (i) the individually observed multiples for each of the transactions selected by Barclays in its analysis, including Enterprise Value/last twelve month (LTM) and Equity Value/LTM DCF; and (ii) the multiples selected and applied by Barclays as part of this analysis*.  The Proxy discloses summary statistics for the multiples observed by Barclays' in its Comparable Transactions analysis, but does not disclose the individual multiples observed for each of the selected transactions.  The omission of this information is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Barclays' has adequately compared the Company's transaction performance to its selected comparables.

71.      *With respect to Barclays' Comparable Transactions Analysis, the separate resulting indications of value for Copano based on this analysis from each of the multiples selected and applied*.  The Proxy discloses summary statistics for the multiples observed by Barclays' in its Comparable Transactions analysis, but does not disclose the individual multiples observed for each

- 23 -

of the selected transactions.  The omission of this information is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Barclays has adequately compared the Company's transaction performance to its selected comparables.

72.     ***With respect to Barclays' Pro Forma Merger Consequences Analysis, the individual magnitudes of accretion/dilution to KMP GP, KMP, and Copano distributions, with respect to the Case I, Case II, and Consensus Case Pro Forma projections in each of the years 2013 through 2016***.  This information should be provided to unitholders so that they may assess whether Kinder Morgan is realizing a windfall under the terms of the Proposed Acquisition and if so, whether Kinder Morgan's offer adequately captures the value of that windfall.

73.     ***With respect to Barclays' Pro Forma Merger Consequences Analysis, the individually observed internal rate of returns ("IRRs") to Copano common units, on a stand-alone basis and with respect to the Case I, Case II, and Consensus Case Pro Forma projections in each of the years 2013 through 2016***.  This information should be provided to unitholders so that they may assess whether Kinder Morgan's offer adequately captures the value of Copano's units.

74.     ***With respect to Barclays' Pro Forma Merger Consequences Analysis, the individual magnitudes of accretion/dilution to KMP GP and KMP distributions, with respect to the Case I, Case II, and Consensus Case Pro Forma projections in each of the years 2013 through 2016, for each of the synergy sensitivities of $0MM, $25MM, and $50MM per year***.  This information should be provided to unitholders so that they may assess whether Kinder Morgan is realizing a windfall under the terms of the Proposed Acquisition and if so, whether Kinder Morgan's offer adequately captures the value of that windfall.

75.     *With respect to Jefferies' Selected Public Companies Analysis for Copano, the following multiples for each of the comparable public companies selected by Jefferies in its analysis of Copano: (i) Current LP Yield; (ii) 2013E Yield; and (iii) 2014E Yield*.  The Proxy sets forth a "summary" of Barclays' Comparable Companies Analysis, but it fails to disclose many of the critical inputs for that analysis.  The omission of the multiples is material because it impacts the Comparable Companies Analysis.  Disclosing the multiples would allow unitholders to determine whether Barclays has properly compared the Company's transaction performance to its selected comparables.

76.     *With respect to Jefferies' Selected Public Companies Analysis for Copano, whether Jefferies conducted any kind of benchmarking analysis for Copano, in relation to the selected comparable public companies, particularly given Copano's significant Eagle Ford play*.  This information is material because unitholders are entitled to know whether the value implied by Jefferies' Public Companies Analysis adjusted for or otherwise took into account the added value from Copano's Eagle Ford operations.

77.     *With respect to Jefferies' Selected Public Companies Analysis for Copano, the multiple yield ranges selected and applied to Copano by Jefferies to derive its range of implied values per Copano common unit*.  The Proxy discloses summary statistics for the multiples observed by Jefferies in its Public Companies Analysis, but it does not disclose the yield ranges applied to Copano.  The omission of this information is material because without the yield ranges, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Jefferies has properly compared the Company to its peers.

78.     *With respect to Jefferies' Selected Public Companies Analysis for Copano, the implied range of values per Copano common unit derived by Jefferies in its analysis*.  The Proxy

discloses summary statistics for the multiples observed by Jefferies in its Public Companies Analysis, but it does not disclose the yield ranges applied to Copano. The omission of this information is material because without the yield ranges, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Jefferies has adequately compared the Company to its peers.

79. ***With respect to Jefferies' Selected Public Companies Analysis for Copano, the financial projections used by Jefferies in its comparable public companies analysis***. The omission of the projections is material because the financial projections are intended to be management's best estimate of the Company's future cash flows, but without disclosure of projections unitholders cannot discern whether Jefferies has adequately captured the value of the Company.

80. ***With respect to Jefferies' Selected Public Companies Analysis for Kinder Morgan, the following multiples for each of the comparable public companies selected by Jefferies in its analysis of Kinder Morgan: (i) Current LP Yield; (ii) 2013E Yield; and (iii) 2014E Yield***. The omission of this information is material because without these multiples, unitholders do not have the information to determine how the implied values for the selected companies actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Jefferies has properly compared the Company to its peers.

81. ***With respect to Jefferies' Selected Public Companies Analysis for Kinder Morgan, whether Jefferies conducted a benchmarking analysis for Kinder Morgan, in relation to the selected comparable public companies***. This information is material because unitholders are entitled to know whether Jefferies improperly adjusted the value of Kinder Morgan upward based upon its operations in relation to its peers.

82. ***With respect to Jefferies' Selected Public Companies Analysis for Kinder Morgan, the multiple yield ranges selected and applied to Kinder Morgan by Jefferies to derive its range of***

*implied values per Kinder Morgan common unit*.  The Proxy does not disclose the yield ranges applied to Kinder Morgan.  The omission of this information is material because without the yield ranges, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Jefferies has adequately compared Kinder Morgan to its peers.

83.     *With respect to Jefferies' Selected Precedent Transactions Analysis, the Transaction Value / next twelve months (NTM) EBITDA multiples for each of the precedent transaction selected by Jefferies in its analysis*.  The omission of this information is material because without these multiples, unitholders do not have the information to determine how the implied values for the selected transactions actually compare to the offer by Kinder Morgan, and thus are unable to assess whether Jefferies has properly compared this transaction to the value offered by previous transactions.

84.     *With respect to Jefferies' DCF Analysis: (i) the definition of levered free cash flow used in the analyses of Copano and Kinder Morgan; (ii) the inputs and assumptions used by Jefferies to derive the ranges of discount rates for Copano (7.5% to 8.5%) and Kinder Morgan (8.5% to 9.5%) in its analyses; and (iii) the financial projections used by Jefferies in its DCF analysis*.  These omissions render the Proxy materially misleading because they have a huge impact on the outcome of the DCF analysis.  Unitholders are entitled to know the basis for the selection of these inputs so that they can determine if they are appropriate and if not, select their own to arrive a value of Kinder Morgan.  Without disclosure of these inputs into Jefferies' DCF analysis, unitholders cannot determine if the outcome of Jefferies' DCF analysis (and thus, the exchange ratio) is an adequate measure of the Company's intrinsic value.

85.     *The specific services Jefferies has provided to any of the parties involved in the transaction, or any of their affiliates, in the last two years, and the total amount of compensation*

*received for such services*.  This information is material because unitholders are entitled to be informed of actual and/or potential conflicts of interests that could inhibit Jefferies' ability to objectively assess the fairness of the merger consideration.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Copano common units who are being and will be harmed by defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

87.     This action is properly maintainable as a class action.

88.     The Class is so numerous that joinder of all members is impracticable.  According to the Company's recent SEC filings, as of January 25, 2013, over seventy-nine million Copano common units were outstanding.  These units are held by hundreds, if not thousands, of beneficial holders.

89.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)     whether the defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)      whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(d)      whether the defendants are unjustly enriching themselves and other insiders or affiliates of Copano;

(e)      whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor, and fair dealing;

(f)      whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including other offers for the Company or its assets;

(g)      whether the Proposed Acquisition compensation payable to plaintiff and the Class is unfair and inadequate; and

(h)      whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

90.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

91.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

92.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

93.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

94.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**COUNT I**

**Breach of Fiduciary Duties Against the Individual Defendants**

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

96.     The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public unitholders of Copano and have acted to put their personal interests ahead of the interests of Copano's unitholders.

97.     By the acts, transactions, and course of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly and recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in Copano units.

98.     The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Copano's unitholders.

99.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith,

candor, and independence owed to the unitholders of Copano because, among other reasons, they failed to:

        (a)     ensure a fair process;

        (b)     fully inform themselves of the market value of Copano before entering into the Proposed Acquisition;

        (c)     act in the best interests of the public unitholders of Copano;

        (d)     maximize unitholder value;

        (e)     obtain the best financial and other terms when the Company's independent existence will be materially altered by the Proposed Acquisition; and

        (f)     act in accordance with their fundamental duties of good faith, due care, and loyalty.

100.    Because the Individual Defendants dominate and control the business and corporate affairs of Copano, and are in possession of private corporate information concerning Copano's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public unitholders of Copano which makes it inherently unfair for them to pursue any Proposed Acquisition wherein they will reap disproportionate benefits to the exclusion of maximizing unitholder value.

101.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have knowingly and recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

102.    As a result of the actions of defendants, plaintiff and the Class have been and will be irreparably harmed.

103.     Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the other members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's terms, and will not supply to Copano's unitholders sufficient information to enable them to make informed decisions regarding the tender of their units in connection with the Proposed Acquisition, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

104.     Plaintiff and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty Against Copano, KMP, KMP GP, and Merger Sub

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

106.     Defendants Copano, KMP, KMP GP, and Merger Sub are sued herein as aiders and abettors of the breaches of fiduciary duty outlined above by the Individual Defendants.

107.     The Individual Defendants breached their fiduciary duties of loyalty, care, candor, and good faith and fair dealing to the Copano unitholders.

108.     Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Copano, KMP, KMP GP, and Merger Sub in aiding and abetting such breaches.

109.     Defendants Copano, KMP, KMP GP, and Merger Sub had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Copano unitholders, and thus knowingly participated in such breaches.

110.    Defendants Copano, KMP, KMP GP, and Merger Sub provided substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to Copano unitholders.

111.    As a result of defendants Copano's, KMP's, KMP GP's, and Merger Sub's aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiff and the other members of the Class were damaged in that they were prevented from obtaining a fair price for their units.

112.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT III

**Against the Individual Defendants and Copano for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a9 Promulgated Thereunder**

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

114.    During the relevant period, the Individual Defendants and Copano disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants and Copano.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

116.    In so doing, the Individual Defendants and Copano made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated

thereunder. By virtue of their positions within the Company, the Individual Defendants and Copano were aware of this information and of their duty to disclose this information in the Proxy.

117.   The Individual Defendants and Copano were at least negligent in filing the Proxy with these materially false and misleading statements.

118.   The omissions and false and misleading statements in the Proxy are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to unitholders.

119.   By reason of the foregoing, the Individual Defendants and Copano have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

120.   Because of the false and misleading statements in the Proxy, plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT IV

### Against the Individual Defendants and Copano for
### Violation of Section 20(a) of the Exchange Act

121.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

122.   The Individual Defendants acted as controlling persons of Copano within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Copano and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

123.    Each of the Individual Defendants and Copano was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

125.    Copano also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

126.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and Copano were each involved in negotiating, reviewing and approving the Proposed Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.

127.    By virtue of the foregoing, the Individual Defendants and Copano have violated section 20(a) of the Exchange Act.

128.    As set forth above, the Individual Defendants and Copano had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Copano's unitholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants, as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for unitholders;

C.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Copano's unitholders and to refrain from entering into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

D.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

DATED: February 28, 2013                         THE WARNER LAW FIRM
                                                 PAUL T. WARNER


                                                      *s/Paul T. Warner*
                                                 _____
                                                 PAUL T. WARNER

                                                 SBN:00791884
                                                 SDTXBN: 25143
                                                 11123 McCracken Circle, Suite A
                                                 Cypress, TX  77429
                                                 Telephone:  (281) 664-7777
                                                 Facsimile: (281) 664-7774

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ARSHAN AMIRI
EDWARD B. GERARD
JUSTIN D. RIEGER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
EDWARD M. GERGOSIAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423

Attorneys for Plaintiff